In re DUKE & BENEDICT, INC., Debtor.

Mid–Hudson Realty Corp., Paul A. Camarda and CAMCO Construction Corp. (a/k/a Hudson Valley Realty Corp.), Plaintiffs–Appellees,

v.

Duke & Benedict, Inc., Peter D. Leibowits Company, Inc., Centennial Golf Club of New York, LLC and Benedict Dairy Farms, Defendants–Appellants.

No. 01 CIV. 11645(WCC). Bankruptcy No. 97 B 20207(ASH).

United States District Court, S.D. New York.

May 24, 2002.

Oxman, Tulis, Kirkpatrick, Whyatt & Geiger, LLP, White Plains, NY, Andrew D. Brodnick, Of Counsel, Attorneys for Plaintiffs–Appellees.

Kaye Scholer, LLP, New York City, Michael J. Crames, Allan M. Pepper, Howard Kleinhendler, Of Counsel, Attorneys for Defendants–Appellants Peter D. Leibowits Company, Inc. and Centennial Golf Club of New York, LLC.

## OPINION AND ORDER

WILLIAM C. CONNER, Senior District Judge.

Defendants-appellants Peter D. Leibowits Company, Inc. ("Leibowits") and Centennial Golf Club of New York, LLC ("Centennial") appeal to this Court pursuant to 28 U.S.C. § 158 from a Declaratory Judgment issued by the Bankruptcy Court, per the Honorable Adlai S. Hardin, Jr., U.S.B.J., dated November 14, 2001 (the "Declaratory Judgment"). The Declaratory Judgment construed the rights of the parties to a contract, referred to as the Modification Agreement, between appellants on the one hand, and debtors Duke & Benedict, Inc. and Benedict Dairy Farms (collectively "D & B") on the other, to require appellants' unconditional transfer of development rights to 74 residences to D & B's assignee, plaintiffs-appellees Mid–Hudson Realty Corp., Paul A. Camarda and CAMCO Construction Corp. (a/k/a Hudson Valley Realty Corp.). Appellants claim that the bankruptcy court erred in: 1) interpreting the Modification Agreement to require an unconditional transfer of development rights where such transfer could result in significant cost to appellants; 2) refusing to apply the doctrine of judicial estoppel to appellees' claims; and 3) ruling that appellees' right to the transfer of development rights was unaffected by their default on tax and sewer charges. Because this Court does not have appellate jurisdiction over the matter, the appeal is dismissed.

## BACKGROUND

The following facts are taken from the Record on Appeal and the parties' briefs, and are undisputed unless otherwise noted.

### I. The Modification Agreement

In 1994, D & B owned 457 acres of property located in the towns of Southeast and Carmel in Putnam County, New York (the "Property"). (Appellees Br. at 4.) On November 11, 1994, D & B entered into a Joint Venture Agreement (the "1994 agreement") with appellant Leibowits, an experienced real estate developer. The 1994 agreement provided that D & B was to contribute 340 acres of the Property, free of liens, for the development of a 27-hole golf course (the "Golf Course Proper-

ty") and thereby own 25% of the joint venture. Appellants were to build and manage the golf course and own 75% of the venture. (Appellants Br. at 2; Camarda Aff., Ex. A.[1]) D & B reserved the remaining portion of the Property in Carmel (the "Excess Acreage") for its own use.

In an agreement dated February 14, 1996, D & B assigned its rights to develop the Excess Acreage to appellees. (Camarda Aff., Ex. 4.) Also in February 1996, a meeting was held with D & B, appellants, appellees and Town of Carmel officials to discuss how approval for the golf course would affect plans for the cluster subdivision. (Appellees Br. at 10.) Town of Carmel officials represented that title to the entire Property should be held by one owner because the Zoning Code of the Town of Carmel (the "Zoning Code") did not recognize the transfer of development rights from one property owner to another, and that the residential development could only succeed through a cluster subdivision application submitted by a single owner. (*Id.*)

By 1996, D & B's financial condition had deteriorated and it was unable to clear the liens on the Golf Course Property as required by the 1994 agreement. (Appellants Br. at 6.) As a result, and in response to the representations made by Town of Carmel officials with respect to transferring development rights, appellants and D & B modified the 1994 agreement through a Modification Agreement, dated September 13, 1996. (Appellants Br. at 6; Appellees Br. at 10; Pepper Decl., Ex. A.) Pur-

suant to this Modification Agreement, D & B agreed to transfer the Property in its entirety to appellants and to give up its 25% ownership in the golf course. (Appellants Br. at 6.) In exchange, appellants paid D & B $2.4 million, the amount required to clear all liens on the property. (Appellees Br. at 10.) D & B also retained the right to develop the Excess Acreage as a cluster subdivision, with the Excess Acreage to be reconveyed after approval for the cluster subdivision was obtained. (Appellants Br. at 7.) In connection with D & B's development concept, the Modification Agreement provided that appellants were to transfer 74 units of density rights from the Golf Course Property in Carmel to the Excess Acreage for the residential housing development. (*Id.*) This much debated provision of the Modification Agreement states that:

[i]n addition to any residential density which may be attributable to the Excess Acreage ... Purchaser[2] agrees, to the extent permitted by local governmental authority in the future, to assign to land of Seller to be designated by Seller, either through a transfer, cluster, or any other means established by local governmental authority in the future, the development rights to 74 additional residences, to the extent that the same may exist, attributable to the Premises[3] in the Town of Carmel for the purpose of additional residential construction on Seller's property. Purchaser agrees to reasonably cooperate in completing the legal transfer, clustering, or conveyance

---

**1.** The "Camarda Affidavit" and "Pepper Declaration" were submitted to the bankruptcy court by appellees and appellants, respectively, in connection with appellees' motion for summary judgment before that court and are included in the Record on Appeal.

**2.** By the terms of the Modification Agreement, "Purchaser" refers to appellants while "Seller" refers to D & B.

**3.** The area designated as the "Premises" in the Modification Agreement consists of the parcels of land that make up the Golf Course Property. (Pepper Decl., Ex. A ¶ 3.)

of up to 74 residential units ... to Seller's land.

(Pepper Decl., Ex. A ¶ 13(c).) This provision also reflected the parties' recognition that no known mechanism existed for effectuating the transfer of density rights from the Golf Course Property to the Excess Acreage.

> The Parties each acknowledge that the mechanism to cluster/transfer has not been identified but that Purchaser will hold the density for Seller until the reconveyance of the property or the permanent transfer/cluster of density regardless of Town ordinances that may be in effect during the application period. Furthermore, the agreement by Purchaser of its willingness to transfer additional development rights ... shall in no way restrict or prohibit Purchaser from developing the Premises for its proposed golf course development. It is agreed that such transfer/cluster of density and Purchaser's cooperation with Seller's development plans will be *at no cost to Purchaser* and that all reasonable expenses incurred by the Purchaser in connection therewith shall be paid by Seller.

(*Id.* (emphasis added).) Also on September 13, 1996, appellants and D & B entered into a separate agreement concerning the lease of the Excess Acreage to appellees (the "Lease").[4] (Pepper Decl.,

Ex. D.) The Lease also provided for D & B's payment of real estate taxes on the Excess Acreage.[5]

Appellants obtained approval for their golf course in 1996 and the course opened for business in 1998. (Appellees Br. at 6.) D & B filed for bankruptcy on January 24, 1997.

## II. *Planning Board Approval*

By letter to appellants dated March 12, 1998, appellees' attorney requested that appellants sign the municipal applications for the cluster subdivision as "Applicant" as well as "Owner." According to appellees, the Carmel Planning Board (the "Planning Board") would not accept the application unless it was signed as such. (Appellees Br. at 16.) Appellants refused to sign as applicant claiming, *inter alia*, that the Modification Agreement only required them to sign as "land owner."[6] (*Id.* at 17.)

Appellees submitted an application for the development of the Excess Acreage, which it called the "Links" project, to the Planning Board on April 29, 1998. (Appellants Br. at 8.) The application included plans to transfer development rights from the Golf Course Property to the Excess Acreage as stated in the Modification Agreement. The Planning Board referred the application to its attorney, Thomas

---

4. The Lease stated that the although title to the Excess Acreage would be conveyed to appellants, appellees would retain full beneficial ownership. Upon transfer of title, appellants would lease the Excess Acreage to appellees for a period of 99 years at no rent with options to extend the lease for two additional 99-year periods. (Pepper Decl., Ex. D ¶¶ 1–2.)

5. Under the Lease, during the time that appellants held title to the Excess Acreage, D & B was to make payments to an escrow account to fund the real estate taxes. D & B's failure to cure a default in tax payments gave appel-

lants the option to reconvey the property to D & B. D & B had no right to cure after three defaults. (*Id.* ¶ 5.)

6. The relevant provision in the Modification Agreement states: "Seller may at its election make the application for subdivision and development of any portion of the Excess Acreage *in Purchaser's name as the land owner* and in its own name and/or the name of its successors or assigns as contract vendees." (Pepper Decl., Ex. A ¶ 13(b) (emphasis added).)

Costello, who, by memorandum dated December 16, 1998, recommended that the Planning Board reject appellees' application. (Appellants Br. at 8; Pepper Decl., Ex. J.) Costello explained that the application was defective because it did not identify the minimum 35% of the area that would be set aside as "open space" pursuant to Zoning Code regulations. Costello further stated that if the cluster subdivision intended to utilize parcels of the Golf Course Property containing the course, clubhouse and related facilities, these improvements would have to be turned over to a homeowners' association. Costello also noted that should appellees submit a new application, it should name appellant Centennial as owner and applicant and appellees as agents empowered to make binding commitments on behalf of Centennial. (Pepper Decl., Ex. J.) After receiving Costello's memorandum, the Planning Board rejected appellees' application. (Appellants Br. at 9.)

On August 29, 2000, appellees moved the bankruptcy court for an injunction directing appellants to sign the cluster subdivision application. (Pepper Decl., Ex. B.) Appellants represented to the court their concern that signing the cluster subdivision application as "Applicant" would subject them to potential liabilities, such as having to convey the golf course to the homeowners' association. Judge Hardin ordered appellants to sign the cluster subdivision application as "Applicant," stating that their refusal to do so was "inexplicable," "unjustified" and a "clear breach of [the Modification Agreement]."

On September 20, 2000, appellees submitted a proposal to the Planning Board, with Centennial as "Co–Applicant," to develop the Excess Acreage (the "Application"). (Appellees Br. at 19.) The Planning Board directed appellees to seek confirmation from the Zoning Board of Appeals for the Town of Carmel (the "Zoning Board") that the Zoning Code allowed golf course property to be used as "open lands" in a cluster subdivision. (*Id.*) Appellees thereby submitted a request to the Zoning Board, in the names of appellant Centennial and appellee Hudson Valley Realty Corp.,[7] requesting an interpretation of the Zoning Code. The interpretation sought to identify the Golf Course Property as "open space" for purposes of cluster density from the golf course to the Excess Acreage. (Appellants Br. at 12.) In its Memorandum of Law attached as part of the Application, appellees represented that "[t]he proposed plan insures that there can be no further development of the [golf course land used to calculate the density for the cluster subdivision]." (Pepper Decl., Ex. K at 5.) By letter dated June 29, 2001, the Zoning Board advised appellees that the Zoning Code would allow golf course property to be dedicated as open space to derive residential density to be utilized by a cluster subdivision. (Appellees Br. at 20; Camarda Aff., Ex. O.)

After learning of appellees request to the Zoning Board, appellants sent a letter to the Planning Board, dated September 10, 2001, in which they stated that they had no knowledge of appellees' representations to the Zoning Board and, furthermore, had never consented to relinquish future development rights of its golf

7. Appellants maintain that appellees were not authorized to make an application in their name. (Appellants Br. at 19.) Appellees, however, claim that they were entitled to make the application because the Modification Agreement explicitly stated that D & B's assignees could "at [their] election make the application for subdivision and development of any portion of the Excess Acreage in Purchaser's name ...." (Pepper Decl., Ex. A ¶ 13(b).)

course, or to dedicate the property as perpetual open space. (Pepper Decl., Ex. M.) In response to appellants' letter, on October 15, 2001, Planning Board Chairman Harold Gary wrote to both appellants and appellees as joint applicants, asking that the parties appear at a Planning Board meeting on November 14, 2001 to clarify issues relating to the Application. (Pepper Decl., Ex. C.) The letter stated that, after receiving appellants' September 10 letter, the Planning Board was "understandably confused as to whether your application is submitted as a residential cluster application or whether we are revisiting the issue of whether the transfer of development rights is permitted in the Town of Carmel." *Id.*

### III. *Instant Adversary Proceeding*

On July 19, 2001, appellees commenced the adversary proceeding which is the subject of this appeal against appellants and D & B. (Camarda Aff., Ex. Q.) Appellees' complaint sought, *inter alia,* damages for appellants' alleged breach of the Modification Agreement by interfering with the Application, injunctive relief directing appellants to perform their duties under the contract and a determination that a constructive trust be placed over the golf course. (*Id.*) Appellees moved the bankruptcy court for summary judgment on all three causes of action on October 22, 2001. Appellants cross-moved for summary judgment on November 7, 2001, seeking a declaration that it was entitled to reconvey the Excess Acreage to D & B based on D & B's default under the Lease for failure to pay taxes.

Oral argument on both motions was held before the bankruptcy court on November 14, 2001. Judge Hardin, ruling from the bench, did not grant summary judgment, but used the opportunity to issue a Declaratory Judgment setting forth the rights and obligations of the parties under the Modification Agreement.[8] (11/14/01 Hr'g Tr. at 65.) The Declaratory Judgment held that: (1) appellants agreed to the unconditional transfer of development rights to the 74 units of the Golf Course Property, with the one exception that the transfer would not restrict the *proposed golf course development;* (2) appellants' September 10, 2001 letter to the Planning Board, which stated that it had not agreed to any conditions affecting the use of its lands or golf course business, conflicted with the unconditional assignment of density rights in the Modification Agreement; (3) the words "at no cost to purchaser" in Paragraph 13(c) referred to out-of-pocket expenses incurred by appellants in connection with their compliance with the Modification Agreement; (4) appellants' contention that the phrase "at no cost to purchaser" bars constraints on appellants' future development rights conflicts with the plain meaning of the agreement; and (5) the fact that appellants paid taxes on the Excess Acreage may be litigated in the future, but does not impact appellees' entitlement to seek Planning Board approval for the transfer of density rights from appellants. (11/14/01 Hr'g Tr. at 77–80.) This appeal followed.

### DISCUSSION

### I. *Appellate Jurisdiction*

Before considering the merits of the appeal, this Court must first consider wheth-

---

**8.** The Planning Board was holding a meeting to discuss the Application on November 14, 2001, the evening that oral arguments were presented on the summary judgment motions. Judge Hardin appears to have issued the De-

claratory Judgment, in part, to inform the Planning Board of the bankruptcy court's opinion as to the rights and obligations of the parties under the Modification Agreement. (11/14/01 Hr'g Tr. at 66.)

er it has appellate jurisdiction over the matter.

## A. *Finality of the Judgment*

■ Appeals as of right from the bankruptcy court are governed by 28 U.S.C. § 158(a) which provides that "[t]he district courts of the United States shall have jurisdiction to hear appeals from final judgments, orders, and decrees ... of bankruptcy judges." In a non-bankruptcy case, "an order becomes a final order if it 'ends the litigation on the merits and leaves nothing for the court to do but execute the judgment.'" *In re Bradlees Stores, Inc.*, 210 B.R. 506, 507 (S.D.N.Y. 1997) (quoting *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 467, 98 S.Ct. 2454, 57 L.Ed.2d 351 (1978)). However, in the context of bankruptcy cases, the concept of finality is construed more liberally. "Because bankruptcy proceedings often continue for long periods of time, and discrete claims are often resolved at various times over the course of the proceedings, the concept of finality that has developed in bankruptcy matters is more flexible than in ordinary civil litigation." *In re Chateaugay Corp.*, 880 F.2d 1509, 1511 (2d Cir.1989).

■ The Second Circuit has explained that bankruptcy orders are appealable as final orders if they "finally dispose of *discrete disputes within the larger case.*" *In re Fugazy Express, Inc.*, 982 F.2d 769, 775 (2d Cir.1992) (emphasis in original) (citation omitted). A dispute "does not mean merely competing contentions with respect to separable issues." *In re Masterwear*

*Corp.*, No. 98 Civ. 0688, 1998 WL 879694, at \*3 (S.D.N.Y.1998) (quoting *In re Miner*, 222 B.R. 199, 202 (2d Cir. BAP 1998)). Rather, a dispute is "at least an entire claim on which relief may be granted." *Id.* A bankruptcy order need not resolve all of the issues raised by the bankruptcy, but, given the strong federal policy against piecemeal appeals, must completely resolve all of the issues pertaining to a discrete dispute, including issues as to the proper relief. *See In re Fugazy*, 982 F.2d at 776. The Second Circuit has noted that "[t]he disposition of a discrete dispute is generally considered to be the resolution of an adversary proceeding within the bankruptcy action." *In re Chateaugay Corp.*, 922 F.2d 86, 90 (2d Cir.1990). In the declaratory judgment context, "resolution of the 'discrete dispute' requires a final determination of the actual controversies between the parties that are the subject of the adversary proceeding." [9] *In re Prudential Lines, Inc.*, 59 F.3d 327, 331 (2d Cir.1995). Also, with respect to a non-injunctive bankruptcy order, a judge's statement of intent to reconsider an issue in the relatively near future might be significant in determining whether the order is final or interlocutory. *See In re Chateaugay*, 880 F.2d at 1513.

■ The Declaratory Judgment that is the subject of the instant appeal does not constitute a "final order" under governing legal standards because it did not dispose of either appellants' or appellees' claims arising from the Modification Agreement. In the adversary proceeding below, the

---

9. Appellants contention that declaratory judgments are automatically reviewable as final judgments is erroneous. (Appellants Reply Br. at 5.) Although 28 U.S.C. § 2201(a) states that a declaratory judgment "shall have the force and effect of a final judgment or decree and shall be reviewable as such," it is also established that "an award of declaratory relief ... is a final order in a case in which only declaratory relief is sought." *Henrietta D. v. Giuliani*, 246 F.3d 176, 180 (2d Cir.2001). Moreover, "when other remedial issues remain unresolved" a declaratory judgment does not have the force of a final judgment. *Id.*

relief sought by appellees' included injunctive relief and damages based on an alleged breach of contract. These issues, along with appellants' cross motion for summary judgment on the basis of appellees' default under the Lease, were presented to the bankruptcy court at oral argument. Judge Hardin, however, deferred decision on these claims, and chose instead to issue a narrow Declaratory Judgment on the question of "the rights and the obligations of [the] effected parties [ ] under the modification agreement *with regard to density.*" (11/14/01 Hr'g Tr. at 66 (emphasis added).) In his ruling, Judge Hardin explicitly reserved decision on issues presented by the parties in their summary judgment motions. *See, e.g., In re Bradlees Stores,* 210 B.R. at 508 (bankruptcy order not final because it did not "entirely dispose of plaintiff's claims arising from defendants' alleged breach of the [contract]" and because the claims in the plaintiff's complaint required further litigation). With respect to appellees' breach of contract claims, Judge Hardin explained that those issues were "really not before me today" and that consideration of the claims would be "premature." [10] (*Id.* at 65–66.) Judge Hardin also noted that, should the Planning Board impose unduly burdensome conditions on appellants, such as the much reiterated fear of conveyance of the "entirety of title to the golf course property to someone else," it would become an issue for future litigation. (*Id.* at 85.)

In support of their finality argument, appellants contend that Judge Hardin deferred ruling on appellees' breach of contract claims because, given the fact that the Planning Board had not yet approved or denied the Application, they were not ripe for adjudication. (Appellants Br. at 6.) As appellants point out, Judge Hardin remarked that the Planning Board's acceptance of the Application could moot appellees' damages claim. First, it must be noted that Judge Hardin did not hold that this issue would necessarily be mooted by a favorable decision of the Planning Board. Moreover, appellants' argument in this respect serves to bolster the conclusion of non-finality. Appellants' contentions on appeal are based in large part on hypothetical conditions that the Planning Board *might* impose on the Golf Course Property if density is transferred. However, no such conditions have yet been imposed. Furthermore, in a letter dated April 5, 2002, appellees submitted to this Court a resolution, dated March 6, 2002, approved by the Carmel Town Board and recommended by the Planning Board ("Proposed Amendment"). The Proposed Amendment seeks to clarify the Zoning Code by stating that only "acreage used in calculating overall density and not used for the siting of dwelling units or as common open space shall be preserved as open space." (Proposed Amendment, Section 2.) As appellees point out, this Proposed Amendment, if adopted, would make it clear that only Golf Course Property used to calculate density on the Excess Acreage would be preserved as open space. This would moot many of the concerns raised by appellants in this appeal, including their stated fear that the entire Golf Course Property would have to be dedicated as open

10. Judge Hardin also explicitly deferred consideration of appellants' arguments with respect to appellees' alleged default in tax payment under the lease. (11/14/01 Hr'g Tr. at 74 –75 ("The tax issue … I've declared my view on that. I don't think its necessary to address that. It has no real relationship to what's proceeding … in the Planning Board.").) Because there has been no final determination on the issue, it is not properly before this Court on appeal.

space.[11] (Appellants Br. at 23 ("Under the bankruptcy court's decision, Centennial could forever lose the right to build even a single house on the Golf Course Property because it could be compelled to dedicate the entire property as open space. This is a 'cost' to which Centennial never agreed.").) As both appellants and appellees illustrate through their arguments, many issues in the underlying adversary proceeding are contingent upon future action of the Planning Board and may be revisited once the Planning Board has made a final decision with respect to the Application.[12]

The holding of non-finality is also supported by the fact that none of the relief sought in appellees' complaint has been granted. The Declaratory Judgment did not award any damages or enjoin any action. *See In re Fugazy*, 982 F.2d at 776 (a final order must resolve issues as to the proper relief). In explaining his ruling, Judge Hardin noted that he was merely "declar[ing] and adjudg[ing] as law of the case certain issues that appear to me to be raised by the pleading. I have carefully refrained from making any statement or finding, or judgment or conclusion with regard to whether or not any conduct of [appellants] is or is not a violation ... nor is there any provision for injunctive or compulsive relief. It simply is declaratory." (11/14/01 Hr'g Tr. at 87.) We thus conclude that because the Declaratory

Judgment is not a final order, it is not reviewable by this Court as of right.

### B. *Leave to Appeal*

 If a bankruptcy court order is not final, 28 U.S.C. § 158(a) allows the district court to grant leave for an interlocutory appeal. Leave to appeal interlocutory bankruptcy orders is governed by the standards set forth in 28 U.S.C. § 1292(b) which dictates the circumstances under which courts of appeals may hear interlocutory orders of the district court. *See In re Johns–Manville Corp.*, 45 B.R. 833, 835 (S.D.N.Y.1984). Under § 1292(b), an interlocutory appeal may be granted when (1) the order appealed from involves a controlling question of law, (2) as to which there is substantial ground for difference of opinion, and (3) an immediate appeal from the order may materially advance the ultimate termination of the litigation. In addition, in order to depart from the basic policy postponing review until the entry of a final judgment, the appeal must present "exceptional circumstances" warranting review. *See In re Alexander*, 248 B.R. 478, 483 (S.D.N.Y.2000).

 The instant order does not meet the three requirements of § 1292(b) because appellants cannot show that the order involves a question of law "as to which there is substantial ground for difference of opinion." "In order to demonstrate that there is substantial ground for a difference of opinion, [appellants] must

11. In a letter dated April 10, 2002, appellants argue that the Proposed Amendment would not moot the issues presented on appeal. However, even assuming that appellants' concerns would not be fully addressed by the passing into law of the Proposed Amendment, the law would undoubtedly have relevance to both appellants' and appellees' positions.

12. After the Planning Board determines which, if any, conditions are to be imposed on the Golf Course Property, the bankruptcy

court is not completely foreclosed from reconsidering the law of the case set forth in its interlocutory Declaratory Judgment, if, for example, the court concludes that the Planning Board's determination presents new evidence or that unconditional acceptance of these conditions by appellants would create "manifest injustice." *See In re Fugazy Express, Inc.*, 159 B.R. 432, 437 (Bankr.S.D.N.Y.1993) (discussing the grounds justifying reconsideration of a prior interlocutory ruling).

show that the issue is difficult and of first impression and involves more than just a strong disagreement among the parties." *In re Ionosphere Clubs, Inc.*, No. 98–9112A, et al., 1999 WL 717291, at *3 (S.D.N.Y. Sept.15, 1999) (internal quotations omitted); *see also In re Alexander*, 248 B.R. at 483 (to satisfy the second requirement of § 1292(b), there must be more than just a strong disagreement between the parties). In support of their contention that the Declaratory Judgment is open to substantial difference of opinion, appellants merely cite pages of their appellate brief which take issue with the bankruptcy court's interpretation of the phrase "at no cost." (Appellants Br. at 22.) Appellants fail to demonstrate that this basic issue of contract construction is "difficult and of first impression." Rather, the pleadings make clear that the issue on appeal involves nothing more than a disagreement among the parties as to the terms of the contract. Moreover, this Court fails to discern any "exceptional circumstances" warranting immediate review. Leave to appeal the interlocutory order of the bankruptcy court is thus denied.

## CONCLUSION

For the foregoing reasons, the Declaratory Judgment of the bankruptcy court is not a final order for purposes of appeal, nor will leave be granted for an interlocutory appeal. The appeal is therefore dismissed for lack of jurisdiction.

SO ORDERED.